SCHOENER *v.* CONTINENTAL MOTORS CORPORATION.

1. ESCHEAT—CODE OF ESCHEATS—CONSTRUCTION OF STATUTES.

The State code of escheats is custodial in nature, as the rightful owner may have restored to him the property taken thereunder or its equivalent; hence, there is no deprivation of property rights of an owner, or of one possessing the rights thereof, of securities or dividends (CLS 1956, § 567.63).

2. SAME—RETROACTIVE APPLICATION OF CODE.

The code of escheats is retroactive in its application to all persons and property coming within its purview (CL 1948, § 567.-73).

3. SAME—CORPORATE REORGANIZATIONS—UNCLAIMED EXCHANGES OF STOCK.

The fact that certain outstanding shares of stock were not exchanged by the owners thereof at time of reorganizations of corporation prior to passage of the code of escheats would not prevent application of the code because of alleged inability to complete the reorganization (CL 1948, § 567.73).

4. CORPORATIONS—REORGANIZATION.

The term "reorganization", as used in connection with corporations, includes a dissolution of the old corporation and organization of a new one to take the property and franchise

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 19 Am Jur, Escheat §§ 5, 51.
[2] 50 Am Jur, Statutes § 479.
19 Am Jur, Escheat § 4.
[3, 6, 7, 13, 14, 17] 19 Am Jur, Escheat § 5.
[4] 13 Am Jur, Corporations § 1204.
[5] 13 Am Jur, Corporations § 1205.
[8, 9, 10] 19 Am Jur, Escheat § 3.
Escheat of personal property of intestate domiciled or resident in another State. 50 ALR2d 1375.
[11, 15] 11 Am Jur, Conflict of Laws § 97.
[12] 19 Am Jur, Escheat § 39.
[16] 19 Am Jur, Escheat § 38.
[18] 14 Am Jur, Costs § 23.

of the first and to continue its business, where the new corporation is formed by practically all of the stockholders and directors of the old organization.

5. SAME—REORGANIZATION.

Corporations may effect their own reorganization, without being reincorporated, by an amendment to the corporate charter properly approved by the requisite vote of the stockholders.

6. SAME—REORGANIZATION—ESCHEATS.

Reorganizations of defendant, a Virginia corporation doing business in this State, were effected within the meaning of the code of escheats, where the certificate of incorporation was amended first by changing the stock from par value to no par value and later from no par value to par value and for exchange of outstanding shares in each instance for new shares (CL 1948, § 567.22).

7. ESCHEAT—REORGANIZATION OF CORPORATION—ABANDONED PROPERTY—EXCHANGE OF STOCK.

The failure of a stockholder to accept a reissue of stock certificate or other evidences of interest by way of exchange upon a reorganization of the corporation is a significant fact in determining whether or not the code of escheats shall be applied to abandoned property under the custodial arrangement provided by the statute (CL 1948, § 567.22; CLS 1956, § 567.-63).

8. SAME—SITUS OF PROPERTY.

Property having its situs in this State is subject to the code of escheats of this State (CL 1948, § 567.11 et seq., as amended).

9. SAME—MAXIMS.

The maxim mobilia sequuntur personam does not apply to property which goes by escheat, as the right claimed is not in the nature of succession.

10. SAME—OVERRULED COMMON-LAW DOCTRINE.

The code of escheats overruled the doctrine of situs of domicile of owner insofar as escheated estates were concerned (CL 1948, § 567.11 et seq.).

11. PROPERTY—STATES.

The State has the same dominion over intangible property as it has over tangible property.

12. ESCHEAT—ADDRESS UNKNOWN.

Escheat is permitted against persons whose addresses or existence are unknown (CL 1948, § 567.11 et seq., as amended).

13. SAME—JURISDICTION OVER DEBTOR.

Power to seize the debt by jurisdiction over the debtor provides not only the basis for notice to the absent owner but also for taking over the debt from the debtor under the code of escheats (CL 1948, § 567.11 *et seq.,* as amended).

14. SAME—CONTROL OVER INTANGIBLE PROPERTY.

Control over escheated intangible property can only arise from control over parties whose relationships are the source of the rights and obligations (CL 1948, § 567.11 *et seq.,* as amended).

15. PROPERTY—SITUS OF INTANGIBLE PROPERTY—COURTS—JURISDICTION.

Situs of intangible property is fictional but control over parties whose judicially coerced action can make effective rights created by the chose in action enables the court with such control to dispose of the rights of the parties to the intangible property.

16. ESCHEAT—JURISDICTION—INTANGIBLES.

The rights of the owners of intangibles, including stock and the dividends thereon, come within the jurisdiction of the court under the code of escheats by notice by publication and the rights of the obligors thereunder by personal service (CL 1948, § 567.11 *et seq.,* as amended).

17. SAME — CORPORATIONS — REORGANIZATIONS — STOCK EXCHANGES —DIVIDENDS.

Defendant, a Virginia corporation authorized to do business in this State, the greater portion of whose property is located within this State, and which maintains a stock transfer office herein, *held,* the holder, not the owner, of property subject to the custodial code of escheats, consisting of unclaimed or unpaid dividends and stock not claimed upon exchanges of stock incident to 2 reorganizations of the corporation effected before enactment of the code (CL 1948, § 567.11 *et seq.,* as amended).

18. COSTS—PUBLIC QUESTION—ESCHEAT—UNCLAIMED CORPORATE STOCK AND DIVIDENDS.

No costs are allowed in suit under the code of escheats by public administrator to obtain custody of unclaimed stock and dividends of foreign corporation that had been unclaimed for more than 7 years, a question of public interest being involved (CL 1948, § 567.11 *et seq.,* as amended).

Appeal from Muskegon; Fox (Noel P.), J. Sub-mitted Ocober 12, 1960. (Docket No. 74, Calendar No. 48,719). Decided January 9, 1961.

Bill by James F. Schoener, administrator of the estates of Albert Allen, and others, disappeared or missing persons, against Continental Motors Corporation, a Virginia corporation, and against the named missing persons, their unknown heirs and assigns, to secure unclaimed, unissued or abandoned corporate stock, unpaid dividends, and sums left from uncashed dividend checks, for purpose of subsequent distribution or escheat. Decree for plaintiff. Defendant corporation appeals. Affirmed.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Irving B. Feldman,* Assistant Attorney General, and *James F. Schoener, in propria persona,* for plaintiff.

*Butzel, Eaman, Long, Gust & Kennedy (A. Hilliard Williams* and *James D. Ritchie,* of counsel), and *Joseph T. Riley,* for defendant Continental Motors Corporation.

CARR, J. This case involves the interpretation and application of certain provisions of PA 1947, No 329, as amended, otherwise known as the Michigan code of escheats.* The bill of complaint was filed on October 18, 1956, the plaintiff being the public administrator duly appointed and acting in Muskegon county. By order of the probate court of said county he was appointed administrator of the combined estates of certain named individuals described as disappeared or missing persons for periods in excess of 7 years, which named persons are indicated as de-

---

* CL 1948, § 567.11 *et seq.,* as amended (Stat Ann 1953 Rev and Stat Ann 1959 Cum Supp § 26.1053[1] *et seq.*).

fendants in the cause with the Continental Motors Corporation.

It was the claim of the plaintiff in bringing such action that said corporation was the holder of certain stock and also of dividends belonging to the alleged missing persons, which stock the owners had failed, neglected, or refused to accept although entitled to receive same from the said corporation, hereinafter referred to as the defendant. It was the position of the plaintiff as set forth in his pleading that he was charged with the duty under the statute above cited to represent the missing owners of the property in question, to conserve their property, and to protect their interests therein and that of their assigns or unknown heirs-at-law. Plaintiff further asserted that demand had been made on defendant for the securities and money involved, that it was the duty of defendant to transfer the same to plaintiff to be dealt with pursuant to the statute of the State, and that defendant had refused the request.

The defendant corporation filed answer to plaintiff's bill of complaint denying his right to the relief asked, and claiming that the property sought to be reached was not subject to the provisions of the Michigan code of escheats, that neither plaintiff nor the probate court for Muskegon county had any jurisdiction in the premises, that the registered owners of a portion at least of the securities involved were nonresidents of Michigan, that the physical situs of the property was not in this State, and that defendant was not a holder thereof within the meaning of the term as used in the statute. On the pretrial hearing the parties entered into a stipulation as to the material facts. It appears therefrom that the Continental Motors Corporation was organized in 1917 under the laws of the State of Virginia. It has continued to exist by virtue of said laws. At the time of the proceeding in circuit court it was authorized to

do business in Michigan, Georgia, and Texas, and it is conceded that since 1923 the greater portion of its assets have been located in this State. It has also, as appears from the stipulation, stock records and a stock transfer agent at Muskegon and, likewise, in the city of New York. It was further agreed that the persons, natural and artificial, listed in an exhibit attached to the pretrial statement were registered stockholders of the defendant, and that the addresses appearing in connection with the respective names were the last known addresses according to the defendant's records. Mail sent to such addresses had been returned to defendant or had been unanswered for periods in excess of 7 years prior to 1954.

The defendant as originally organized in 1917 provided for capital stock consisting of 1,500,000 shares of common stock of the par value of $10 each. In 1922, by action of the board of directors and the stockholders, and in accordance with the Virginia law, the certificate of incorporation was amended, changing stock to "no par" shares. Provision was made for the exchange of outstanding shares for the new stock, and the stockholders were notified accordingly. Exchanges were duly made except as indicated in exhibit 1 to the pretrial statement.

In 1935 the board of directors and stockholders again took action to amend the certificate of incorporation, changing the common stock from "no par" to a par value of $1 per share, and providing for an exchange of the outstanding shares for new shares. Stockholders were given notice with reference to the procedure, and all parties having the right to exchange did so except as listed in exhibit 1 . The parties stipulated as to the correctness of said exhibit and agreed that it should be received in evidence in the trial court together with a certified copy of the certificate of incorporation of defendant, as amended, a photostatic copy of the notice sent to stockholders

following the 1935 action above referred to, and an official compilation of the Virginia corporation law as issued by the corporation commission of that State. It was further agreed that the official records of the probate court of the county of Muskegon might be received in evidence, subject to defendant's objections as asserted in its answer to the bill of complaint.

The exhibit listing the missing persons designated as defendants in the case, attached to the pretrial statement, was submitted to the trial judge and incorporated in the final decree entered. Said parties were named in 5 separate classes, in accordance with the particular status of each such party. The first class embraced so-called nonresident holders of shares of the $10 par stock of the corporation, with their last known addresses, the number of shares held by each, and dividends withheld pending exchange of stock pursuant to action of the corporation. Included in this class were 5 shareholders holding in the aggregate 122 shares of stock with a total amount of dividends withheld of $869.60.

The second class of missing persons listed included nonresident holders of outstanding stock of no par value with an aggregate of 3,431 shares of stock, dividends withheld of $9,606.80, and uncashed dividends of $68.20. The third class was comprised of stockholders indicated as residents of Michigan, holding no par value stock in the aggregate amount of 198 shares distributed among 9 holders. In this class the amount of dividends withheld was $554.40, and the amount not cashed $3.75. In the fourth class were included alleged nonresident holders of stock owning in the aggregate 775 shares, to whom dividends in the sum of $1,612.01 were forwarded and returned to the defendant by the post office. The fifth class listed a single Michigan stockholder owning 100 shares of $1 par value stock, the dividends on which had been surrendered by the corporation to the

Michigan board of escheats. The exhibit in question indicates the situation with reference to each of the alleged missing persons whose interests are involved in the case.

The statute here in question, the Michigan code of escheats, defines in rather specific terms the property subject thereto and the duties of the attorney general of the State and of the State board of escheats in the administration of the act. Said board is required to make inquiry* in the different counties of the State to ascertain if there is property therein that has escheated, is subject to escheat, or is escheatable, in accordance with the Constitution,* the general laws of the State, or the provisions of the code, which condition may result: (a) because of the death of the owner intestate, leaving no heirs; (b) by reason of the owner having disappeared or being missing from his last known address for a continuous period of 7 years or more, leaving no known heirs; or (c) by reason of property abandoned by the owner, as such term is defined in the act. The property interests involved in the instant suit are of such nature as to be within the scope of the statute if the provisions thereof are applicable under the agreed facts.

The Michigan code of escheats is custodial in nature, provision being specifically made for the rightful owner of securities that have been taken into possession by virtue of proceedings under the act to have restored to him the property taken or its equivalent.† There is, in other words, no deprivation of property rights of an owner, or of one possessing the rights thereof, of securities or dividends. Questions that might arise if the Michigan act was other than custodial in nature are not involved. As sug-

---

* See CL 1948, § 567.12 (Stat Ann 1953 Rev § 27.1053[2]). For constitutional provisions see Const (1908), art 6, § 20, art 10, § 18, and art 11, § 12.—REPORTER.

† See CLS 1956, § 567.63 (Stat Ann 1959 Cum Supp § 26.1053[53]. —REPORTER.

gested at the outset we are primarily concerned in the present case with the interpretation, and application, of the code of escheats.

Directly involved in the case are the provisions of section 12 of the statute (CL 1948, § 567.22 [Stat Ann 1953 Rev § 26.1053(12)]) which reads as follows:

"Whenever any corporation or unincorporated association which shall have been doing business in this State shall be in process of voluntary reorganization or dissolution by virtue of a statute of this State, or otherwise, wherein certificates of shares of stock, or membership, or other evidences of interest therein remain unclaimed by the owner thereof, or wherein the owner has failed or neglected to claim interest, profit, dividends or other increment thereon duly declared in such reorganization or dissolution proceedings, or has failed, neglected, or refused to accept a reissue of said certificates or other evidences of interest, or exchange therefor, and such failure, neglect or refusal has continued for the full period of dormancy, as defined in this act, then such certificates, reissued or exchanged certificates and the interest, profits, dividends or other increment thereon, as well as an exchange for cash provided for in such proceedings, shall be deemed to be abandoned property and shall be reported to the State board of escheats by the holder thereof, or any committee or other fiscal agent in charge of such reorganization or dissolution, as required by section 6 or 8 of this act: Provided, That said holder, committee, or fiscal agent may deliver such property, together with the increment thereon, to the State board of escheats, notwithstanding that the said full period of dormancy has not elapsed, in which case the further procedure in relation to such property, and the protection of the interests of the owners thereof, shall be in conformity with the provisions of section 19 of this act: Provided further, That if the full period of dormancy has elapsed the attorney general or the State public

administrator shall cause proper proceedings to be instituted for a determination of abandonment and the descent of such property to the State of Michigan as an escheat as provided in this act."

Counsel for defendant have directed attention to the fact that the present code was enacted subsequent to the changes in its corporate financial structure made in 1922 and again in 1935. It may be noted in this connection that section 63 of the act (CL 1948, § 567.73 [Stat Ann 1953 Rev § 26.1053(63)]) specifically provides that:

"This act, in all of its provisions, is intended to be retroactive, and it shall be construed as applying retrospectively to all persons and property coming within its purview."

The further suggestion is made on behalf of appellee that the action contemplated by the amendments to the certificate of incorporation in 1922 and in 1935 have not been fully completed due to the fact that certain outstanding shares of stock were not exchanged by the owners thereof. In other words it is asserted that the process of effecting the reorganizations has not been completed, and that, for such reason, the application of the present code of escheats is not open to question. Obviously the present case is concerned with the situation existing when the suit was started. The present statute was then in force and effect, and its provisions suggest no question as to the intent of the legislature. The language above quoted is conclusive in this respect.

Counsel for appellant emphasize the provisions of section 12 of the code of escheats, above quoted, and assert that what was done by defendant in 1922 and again in 1935 did not amount to a reorganization in either instance, within the meaning of the term as used in said section. It is insisted that since defendant is a Virginia corporation, and the actions taken

were in conformity with the statutes of that State, whether the changes brought about by amending the certificate of incorporation amounted to a reorganization must be determined in accordance with Virginia law.   In this connection attention is directed to the decision in *Craddock-Terry Company* v. *Powell,* 180 Va 242 (22 SE2d 30).   In that case it appears that the corporation involved was subjected to serious financial stress as a result of the depression of 1929.   To strengthen its position a plan was adopted involving the formation of a new corporation, the exchange of shares of stock therein for outstanding shares in the original company, the common stock changed from a par value of $100 per share to no par value, and the continuation of the business with the same stockholders and directors.   The overall result was that the corporation was permitted to carry on its business with an unimpaired capital structure and, hence, was in a more advantageous position from the standpoint of obtaining credit and meriting confidence in the business world.   The question at issue in the case was whether what was done amounted to a liquidation or a reorganization.   The court, emphasizing the results of the carrying out of the plan, concluded that it was a reorganization.

In reaching such conclusion the Virginia court (p 251) quoted with approval from 19 CJS, Corporations, § 1578, p 1318, as follows:

"Reorganization, in the law of corporations, has been defined to mean that by some process a corporation has organized anew, usually effected by the dissolution of one and the organization of a new corporation to take the property and franchise of the first and to continue its business.   *   *   *   It has been held that where a new corporation is formed by stockholders and directors of an existing corporation, and its directors and practically all the stockholders, franchises, and property are identical with

those of the old corporation, the transaction both in fact and in law amounts to a reorganization of the old corporation."

That the language quoted was applicable to the situation presented to the Virginia court is obvious. We do not think, however, that the court meant to imply in its decision that a reorganization of a corporation necessarily involves the formation of a new corporation to which the assets, franchises, et cetera, are transferred. It will be noted that the language quoted indicates that a changed situation is brought about by "some process" and that "usually" the method is followed of dissolving the old corporation and organizing a new one to take over as was done in the *Craddock-Terry Case.* Such language imports that the term "reorganization" is not limited to such method of procedure. This is emphasized by the fact that in a subsequent statement in the same volume of Corpus Juris Secundum, Corporations, § 1584, found on p 1331, it is said:

"Corporations may, and sometimes do, effect their own reorganization, and this without being reincorporated. This may properly be accomplished by an amendment to the corporate charter properly approved by the requisite vote of the stockholders."

In the instant case defendant, in 1922 and 1935, obviously did not deem it necessary to form a new corporation with its then present directors and stockholders. Rather, it undertook to accomplish the desired result by amending the certificate of incorporation in the manner above stated. In so doing it accomplished precisely what the Virginia corporation involved in the decision above considered secured by following the procedure indicated. We think the result attained is the controlling feature and that under section 12 of the Michigan statute, above quoted, what was done by defendant amounted to reorganiza-

tions.  Particularly significant are the provisions of said section dealing with the situation resulting from a reorganization, including specifically the reference to the failure on the part of a stockholder to accept a reissue of stock certificates or other evidences of interest by way of exchange.  This language clearly covers the situation presented in the instant case and it seems apparent that the legislature intended to make provision for disposal of the abandoned property under the custodial arrangement provided by the statute.  We are primarily concerned here with the interpretation of the Michigan act, but we see no conflict between the conclusion indicated as to such interpretation and the holding in the Virgina case on which appellant relies.

On behalf of appellant it is contended that the physical situs of shares of stock in defendant corporation owned by nonresidents of the State is not in Michigan.  As before noted, certain owners of stock listed on the company's records as having residences other than in this State had the right to exchange such stock for new stock issued in accordance with the action of the corporation in 1922 and in 1935.  In the present suit it is the right of such exchange, and new certificates issued in accordance therewith, that plaintiff seeks to reach and take into custodial possession.

Counsel insist on the application of the general rule that the place of domicile of the owner determines the situs of personal property in the absence of statutory provision to the contrary.  Significant in this respect is the amendment to section 6 of the code of escheats by PA 1955, No 81.*  Said amendment modified the provision of the section as originally enacted with reference to the duty of a foreign corporation doing business in this State to report

---

* CLS 1956, § 567.16 (Stat Ann 1959 Cum Supp § 26.1053[6]).

abandoned property belonging to a resident of Michigan by adding thereto the clause:

"except that such shares of stock, or membership, or other evidences of interest, and the interest, profits, dividends or other increment thereon, as well as cash, as set forth in section 12 of this act, the physical situs of which properly is within the State of Michigan, shall be deemed to be abandoned property and shall be reported to the State board of escheats by the holder thereof without regard to the last known address of the owners."

It will be noted that the controlling section as to property that is subject to the act is section 12. However, the amendment to the prior section may properly be read in connection therewith, and it may be assumed that the purpose of the legislature in the enactment of the amendment was to harmonize the provisions of sections 6 and 12. If, therefore, in the instant case the property that plaintiff seeks to reach has its situs in Michigan it is subject to the code of escheats.

In *In re Rapoport's Estate,* 317 Mich 291, it appears that the intestate was domiciled in the State of California at the time of his death. At that time he had a deposit in a Detroit bank and was also the owner of certain stocks and bonds that had been left with said bank for safekeeping. Ancillary administration was taken out in Michigan and an order was entered by the probate court assigning such property to the Michigan board of escheats. On appeal the circuit court of Wayne county affirmed the order and this Court did likewise, rejecting the claim of the California administrator and of the State of California that the legal situs of intangible personal property owned by decedent was in California. In reaching the conclusion indicated this Court quoted (p 303) from 11 Am Jur, Conflict of Laws, § 83, p 371, as follows:

" 'Inasmuch as when a person dies intestate without heirs and the property goes by escheat, the right claimed is not in the nature of a succession, the maxim *"mobilia sequuntur personam"* does not apply, and the country in which the property is located is entitled to the funds rather than the country in which decedent was domiciled and of which he was a citizen.' "

It was indicated (p 304) that the escheat law of the State then in effect had overruled the doctrine of situs of domicile insofar as escheated estates were concerned. We think the present statute is subject to a like interpretation.

In *Security Savings Bank* v. *State of California,* 263 US 282 (44 S Ct 108, 68 L ed 301, 31 ALR 391), the court had before it a suit instituted by the State of California to obtain possession of certain deposits in the Security Savings Bank which had been unclaimed for more than 20 years and to have such deposits declared escheated. The bank and the depositors were named as defendants. It does not appear that any of the latter were personally served nor were the last known residences thereof shown. The proceedings taken were in accordance with the California code of civil procedure and judgment for the plaintiff was affirmed by the State supreme court.

On appeal the United States supreme court affirmed the decision. In discussing the situation, it was said (pp 285, 286):

"The unclaimed deposits are debts due by a California corporation with its place of business there. *State* v. *Anglo & London Paris National Bank of San Francisco,* 186 Cal 746, 753 (200 P 612); *State* v. *Security Savings Bank,* 186 Cal 419, 423 (199 P 791). The debts arose out of contracts made and to be performed there. *Farmers & Merchants Bank of Monroe* v. *Federal Reserve Bank of Richmond,* 262 US 649, 660 (43 S Ct 651, 67 L ed 1157, 30 ALR 635).

Thus the deposits are clearly intangible property within the State. Over this intangible property the State has the same dominion that it has over tangible property. *Pennington* v. *Fourth National Bank of Cincinnati,* 243 US 269 (37 S Ct 282, 61 L ed 713 LRA1917F, 1159); *Bank of Jasper* v. *First National Bank of Rome, Georgia,* 258 US 112, 119 (42 S Ct 202, 66 L ed 490). It was settled in *Provident Institution for Savings* v. *Malone,* 221 US 660 (31 S Ct 661, 55 L ed 899, 34 LRA NS 1129), that, where the procedure is appropriate, neither the due process clause, nor any right of the bank under the contract clause, is violated by a law requiring it to pay over to the State as depositary savings deposits which have long remained unclaimed. Compare *Cunnius* v. *Reading School District,* 198 US 458 (25 S Ct 721, 49 L ed 1125, 3 Ann Cas 1121); *Blinn* v. *Nelson,* 222 US 1 (32 S Ct 1, 56 L ed 65, Ann Cas 1913B, 555). The contract of deposit does not give the banks a tontine right to retain the money in the event that it is not called for by the depositor. It gives the bank merely the right to use the depositor's money until called for by him or some other person duly authorized. If the deposit is turned over to the State in obedience to a valid law, the obligation of the bank to the depositor is discharged. *Louisville & Nashville R. Co.* v. *Deer,* 200 US 176 (26 S Ct 207, 50 L ed 426). It is no concern of the bank's whether the State receives the money merely as depositary or takes it as an escheat."

The court further rejected the contention of the bank that it was denied due process under the California statute, and further pointed out that the proceeding was not one *in personam,* at least so far as the depositors were concerned. The purpose of the action was to have the deposits transferred to the State. It was likened to a proceeding *in rem* or one *quasi in rem.* The court declared that the essentials of jurisdiction were the seizure of the *res* at the com-

mencement of suit and reasonable notice and opportunity to be heard.  These requirements were held satisfied by the California statute, the court further commenting (pp 287, 288):

"Seizure of the deposit is effected by the personal service made upon the bank.  *Provident Institution for Savings* v. *Malone,* 221 US 660 (31 S Ct 661, 55 L ed 899, 34 LRA NS 1129).  Thereby the *res* is subjected to the jurisdiction of the court.  Compare *Miller* v. *United States,* 11 Wall (78 US) 268, 297, 298 (20 L ed 135); *Alexandria* v. *Fairfax,* 95 US 774, 779 (24 L ed 583).  The service upon the bank has the same effect as had service of the injunction in *Pennington* v. *Fourth National Bank of Cincinnati,* 243 US 269 (37 S Ct 282, 61 L ed 713, LRA1917F, 1159); or the service upon the garnishee in *Harris* v. *Balk,* 198 US 215, 223 (25 S Ct 625, 49 L ed 1023, 3 Ann Cas 1084); or the application for administration of the debt due an absentee in *Cunnius* v. *Reading School District,* 198 US 458 (25 S Ct 721, 49 L ed 1125, 3 Ann Cas 1121); or the levy of the writ and return of the fact to the court on attachment of the real estate in *Cooper* v. *Reynolds,* 10 Wall (77 US) 308 (19 L ed 931).  The fact that the claim of the State to the deposit may be defeated by the appearance of the debtor or other claimant does not, as argued, prove that the deposit was not seized.  An attachment of real estate is a seizure, although it may be dissolved by bankruptcy or otherwise."

In *Connecticut Mutual Life Insurance Co.* v. *Moore, Comptroller of the State of New York,* 333 US 541 (68 S Ct 682, 92 L ed 863), suit was brought by 9 insurance companies incorporated in States other than New York for a declaration as to the validity of the so-called abandoned property law of New York as applied to the plaintiffs, and to enjoin the defendant State officer from taking proceedings under said statute.  It was claimed on behalf of the

plaintiffs that the State had no power to take over
moneys due to its residents on policies issued for de-
livery in the State on the ground that only the States
of incorporation could claim such moneys. It was
insisted that only one State might take custody of a
debt. The court declined to consider what other
States might do under the facts presented in the
case, saying (p 548):

"To prevail appellee need only show, as he does
as to policies on residents issued for delivery in New
York, that there may be abandoned moneys, over
which New York has power, in the hands of appel-
lants. The question is whether the State of New
York has sufficient contacts with the transactions
here in question to justify the exertion of the power
to seize abandoned moneys due to its residents."

The question of Constitutional power involved was
determined in favor of the State, and the judgment
from which the companies had appealed was af-
firmed.

In accord with the foregoing decisions relating to
the subject is *Standard Oil Co.* v. *New Jersey,* 341
US 428 (71 S Ct 822, 95 L ed 1078). There proceed-
ings were brought in a State court to escheat to de-
fendant State certain personal property comprising
unclaimed shares of the appellant corporation stock
and unclaimed dividends thereon. Personal service
was had on the corporation, and notice identifying
the property and the last known owners was given
by publication. Standard Oil Company was organ-
ized under the law of New Jersey but had no office or
place of business in that State other than a statutory
registered office. The stock was issued and the div-
idends held in other States, and the last known ad-
dresses of the owners were chiefly in other States
and in foreign countries. In sustaining the validity
of the New Jersey statute and affirming the judgment

rendered from which appeal was taken the court referred to prior decisions involving the legal questions raised by the appellant, saying in part (pp 438–441):

"Appellant is a corporation of New Jersey, amenable to process through its designated agent at its registered office. NJ Rev Stat (Cum Supp 1945–1947) 14:4–1, 14:4–2. *Cf. State v. Garford Trucking, Inc.,* 4 NJ 346 (72 A2d 851, 16 ALR2d 1407). This gave New Jersey power to seize the *res* here involved, to wit, the 'debts or demands due to the escheated estate.' And the fact that this is immediate escheat is not significant. Escheat is permitted against persons whose addresses or existence is unknown. The taking-over in the bank deposit cases foreshadowed escheat. See *Provident Institution for Savings v. Malone,* 221 US 660, 664 (31 S Ct 661, 55 L ed 899, 34 LRA NS 1129); *Security Savings Bank v. State of California,* 263 US 282, 283, 290 (44 S Ct 108, 68 L ed 301, 31 ALR 391); *Anderson National Bank v. Luckett,* 321 US 233, 241 (64 S Ct 599, 88 L ed 692, 151 ALR 824).

"No matter where the appellant's assets may be, since it is its obligation to pay to the escheated estate that is taken, personal service on appellant effects a seizure of that obligation in just the same way that service on a bank is seizure of the deposit as shown in the *Notice* subdivision of this opinion, *supra,* p 432. That power to seize the debt by jurisdiction over the debtor provides not only the basis for notice to the absent owner but also for taking over the debt from the debtor. *Security Savings Bank v. State of California, supra,* at 287. It is true that fiction plays a part in the jurisprudential concept of control over intangibles. There is no fiction, however, in the fact that choses in action, stock certificates and dividends held by the corporation, are property. Whether such property has its situs with the obligor or the obligee or for some purposes with both has given rise to diverse views in this court.

"We see no reason to doubt that, where the debtor and creditor are within the jurisdiction of a court, that court has constitutional power to deal with the debt. Since choses in action have no spatial or tangible existence, control over them can 'only arise from control or power over the persons whose relationships are the source of the rights and obligations.' *Estin* v. *Estin,* 334 US 541, 548 (68 S Ct 1213, 92 L ed 1561, 1 ALR2d 1412). Situs of an intangible is fictional but control over parties whose judicially coerced action can make effective rights created by the chose in action enables the court with such control to dispose of the rights of the parties to the intangible. Since such power exists through the State's jurisdiction of the parties whose dealings have created the chose in action, we need not rely on the concept that the asset represented by the certificate or dividend is where the obligor is found. The rights of the owners of the stock and dividends come within the reach of the court by the notice, *i.e.,* service by publication; the rights of the appellant by personal service. That power enables the escheating State to compel the issue of the certificates or payment of the dividends. Compare *Great Northern R. Co.* v. *Sutherland,* 273 US 182, 193 (47 S Ct 315, 71 L ed 596). This gives New Jersey jurisdiction to act. That action, of course, must be in accord with the boundaries on legislation set by the Constitution."

In connection with the holding in the *Standard Oil Company Case* it is of interest to note the comment of Justice Brennan in *State* v. *Western Union Telegraph Company,* 17 NJ 149, 159, 160 (110 A2d 115) as follows:

"Mr. Justice Reed's opinion for the majority suggests, however, that the fact that Standard Oil Company was a New Jersey corporation was not the only predicate of State power to escheat intangibles. His expression, equally applicable to a foreign corpora-

tion authorized to do business in this State, implies that the test of State power to seize the debt is simply whether the debtor corporation is amenable to process in a State action in which adequate notice can be given the creditor. He states: * * *

" 'That power to seize the debt by jurisdiction over the debtor provides not only the basis for notice to the absent owner but also for taking over the debt from the debtor. * * * It is true that fiction plays a part in the jurisprudential concept of control over intangibles. There is no fiction, however, in the fact that choses in action, stock certificates, and dividends held by the corporation, are property.' "

It may also be noted that in *Wheeling Steel Corp.* v. *Fox, State Tax Commissioner,* 298 US 193 (56 S Ct 773, 80 L ed 1143), it was recognized that intangible property, like accounts receivable and bank deposits, may have a situs for taxation in a State other than that of the owner's domicile. Appellant's arguments as to the validity of the State statute were rejected, the Court, speaking through Chief Justice Hughes, concluding (p 215):

"that appellant has failed to show that West Virginia in laying the tax has transcended the limits of its jurisdiction and thus deprived appellant of its property without due process of law."

Under the general principles recognized and applied in the foregoing decisions, and in other cases of like nature, we think that appellant's claim that the situs of the property involved in the suit may not be said to be within the State of Michigan is without merit. This is the State in which the greater portion of defendant's property is located, and in which its major business operations are conducted. It has acquired here a business or commercial domicile of the character mentioned by Chief Justice Hughes in *Wheeling Steel Corp.* v. *Fox, supra.* It is amenable

to the service of process in Michigan and, in consequence, the property rights involved may be reached and subjected to the jurisdiction of the State courts. The rights of appellant as well as of the owners of the property involved, whether the original owners or others claiming under them, are fully protected. We are concerned with the matter of custody of these intangible assets, and no one is in position to complain if such custody is taken from the appellant and reposed in the State. No claim is made that the stock and the dividends thereon involved in the suit may rightfully be claimed by the corporation.

Closely allied with the question as to whether the property involved in the suit has a situs in Michigan for the purposes of the Michigan code of escheats is the further issue raised by appellant by its denial that it is a "holder" of such property. Decisions above cited, and the principles therein recognized, are in point in the determination of such issue. The term is defined in section 5, subd (d)* of the statute as follows:

"The term 'holder' means any person, as hereinbefore defined, having possession, custody or control of the property of another person, and includes a bank, either State or national; savings and loan association; credit union; a post office; a trust company; a depository; a bailee; a trustee; a receiver or other liquidating officer; a fiduciary; a governmental department, institution or agency; a municipal corporation and the fiscal officers thereof; a custodian or officer appointed by a court to receive, keep, handle or disburse money or other funds or property; a public utility, insurance or service corporation; and every other legal entity doing business in this State. This definition shall be construed as distinguishing the term 'holder' of property from the term 'owner' of property as hereinbefore defined, and

---

* CLS 1956, § 567.15 (Stat Ann 1959 Cum Supp § 26.1053[5]).

as excluding from the term 'holder' any person holding or possessing property by virtue of title or ownership."

As before noted, appellant maintains a stock transfer office in this State. The owners of the corporate stock and dividends thereon involved in the case have merely the right to have new stock issued to them by appellant, and to receive unpaid dividends owing on such stock. That right is subject to enforcement by court action. We conclude that the situs of the intangible property in dispute is in Michigan, that appellant is subject to the Michigan code of escheats, and is a "holder" of the property in question.

Appellant is within the scope of the quoted definition of such term. It is not the owner of the property but is merely the custodian thereof for the benefit of the several owners. The custody that plaintiff seeks may be obtained only from the corporation which, under the factual situation involved, is subject to the jurisdiction of the courts of this State in the enforcement of the statute on which the suit is based.

The decree of the trial court is affirmed. A question of public interest being involved, no costs are allowed.

DETHMERS, C. J., and KELLY, SMITH, BLACK, EDWARDS, and SOURIS, JJ., concurred.

KAVANAGH, J., did not sit.